20 A.3d 458

J.M.S. AND G.S., HUSBAND AND WIFE, AND S.S., PLAINTIFFS–APPELLANTS, v. J.W. AND E.W., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued telephonically April 13, 2011—Decided June 20, 2011.

Before Judges A.A. RODRÍGUEZ, C.L. MINIMAN and LEWINN.

*Richard C. Klein* argued the cause for appellant (*Becker Meisel, LLC*, attorneys; *Mr. Klein* and *Drew A. Molotsky*, on the briefs).

*Mark P. McAuliffe* argued the cause for respondents (*McNerney & McAuliffe*, attorneys; *Mr. McAuliffe* and *Michele Austin*, on the briefs).

The opinion of the court was delivered by

LEWINN, J.A.D.

Plaintiffs, J.M.S. and his former wife, S.S., are the paternal grandparents of J.W., born in 1999, and T.W., born in 2001; G.S. is J.M.S.'s current wife. Defendants, J.W. and E.W., are the adoptive parents and are cousins of the children's biological mother, J.M.[1]

This appeal requires us to consider plaintiffs' request for grandparent visitation where (1) plaintiffs were the children's temporary

---

[1] The record does not reflect which defendant is a cousin to J.M. It is, however undisputed that a family relationship exists between defendants and J.M.

foster parents for almost two years; (2) the children were later adopted by defendants who are related to the children's mother; and (3) defendants afforded plaintiffs visitation for two years following the adoptions and then terminated visitation for personal reasons. We conclude that the Adoption Act, *N.J.S.A.* 9:3–38 to –56, does not preclude plaintiffs from seeking visitation under the grandparent visitation statute, *N.J.S.A.* 9:2–7.1, as the judge below found largely in reliance on *In re Adoption of a Child by W.P.*, 163 *N.J.* 158, 748 *A.*2d 515 (2000). *W.P.*, which addressed the issue of grandparent visitation in the context of a nonrelative adoption, *id.* at 160, 748 *A.*2d 515, is not dispositive of plaintiffs' claims. We therefore reverse the October 15, 2010 order granting summary judgment to defendants; we reinstate plaintiffs' complaint for grandparent visitation [2] and remand for further proceedings.

The children were born in New York to J.M. and M.S.; the latter is the biological son of J.M.S. and S.S. In 2003, the New York Department of Social Services (NYDSS) for Rockland County terminated the parental rights of J.M. and M.S. NYDSS placed the children with J.M.S. and G.S. as temporary foster parents in March 2003.

In December 2004, NYDSS transferred custody of the children to defendants, who reside in New Jersey. Plaintiffs consented to this transfer. J.M.S. asserted that plaintiffs consented "to the change with th[e] clear understanding that [they] would stay very closely involved with the children." [3]

Defendants adopted the children in Rockland County on April 20, 2006. The orders of adoption state that "all ... persons whose consents are required ... hav[e] personally appeared before th[e]

---

[2] In their complaint, plaintiffs alternatively sought custody of the children. The October 15, 2010 order dismissed their complaint in its entirety. On appeal, plaintiffs challenge only the denial of grandparent visitation and have abandoned their quest for custody.

[3] We summarize the pertinent factual background from the various pleadings filed in this matter.

[c]ourt for examination." There is no indication in the record that plaintiffs opposed the adoptions.

On April 16, 2010, plaintiffs filed their complaint for custody and/or grandparent visitation, as well as a motion for a change of custody and the appointment of a guardian for the children. The complaint alleged that from December 2004 to October 2008, plaintiffs "remained an integral and essential part of the children's lives, including regular and frequent day, overnight, weekend, and school break, holiday and summer visits.... [They] participated with the children and ... [d]efendants in family gatherings, school activities, church and sporting events."

The complaint further alleged, however, that

[b]eginning in or about December[ ] 2008, ... [d]efendants began to cut ... [p]laintiffs out of the children's lives. Immediately, almost all visits to ... [p]laintiffs' home were denied and [p]laintiffs were excluded from all activities with the children unless in [d]efendants' presence. With increasing frequency [d]efendants refused to inform [p]laintiffs of events, and then flatly denied them visits and/or access to the children.

The complaint further asserted that since 2009 defendants' "level of care for the children, the children's living environment, their physical health, mental health, safety and general well-being have all deteriorated. The children are now suffering both emotionally and physically as a result of a lack of diligent care by ... [d]efendants."

In support of plaintiffs' motion, J.M.S. certified that they "have now been effectively cut out of the children's lives completely and the loss of contact is causing immediate and serious psychological and emotional harm to the children." He set forth at length allegations that the children's health, well being and safety were at risk, including: (1) the complete loss of contact between the children and their grandparents who had been the children's caretakers from March 2003 to December 2004; (2) the children were experiencing a "feeling of isolation through a controlling environment ... [and] do not feel the warmth of a loving family"; (3) they have "not undergone regular, comprehensive medical checkups"; (4) they "have suffered physical harm at the hands of

their older adoptive siblings"; and (4) J.W. has particular needs that require an individualized education program (IEP) and the IEP afforded him in New York has not been continued in New Jersey. J.M.S. asserted that the children's best interests would be served if they were returned to plaintiffs' "permanent custody. At the very least, if custody is not granted, their best interests will be served by open, regular, scheduled access to [plaintiffs] through substantial visitation."

Defendants filed a cross-motion seeking (1) dismissal of the complaint for "lack of jurisdiction and standing to proceed"; (2) an order enjoining plaintiffs from contacting the children's "schools, athletic coaches or health care providers"; and (3) counsel fees. E.W. certified that the children "are integral members of [their] family unit"; plaintiffs refused to adopt the children because they "believed that it would conflict with their lifestyle at that time"; and plaintiffs had unduly interfered in defendants' efforts to raise and care for the children by criticizing their lifestyle and unilaterally contacting the children's schools and health care providers against defendants' wishes.

Regarding the jurisdictional issue, E.W. asserted that it "is improper, based upon the New York adoption, for ... [p]laintiffs to come to a New Jersey court seeking information and access regarding ... [the] children." Furthermore, she contended, the "net effect of the New York adoption is to eliminate [p]laintiff[s'] legal standing to bring th[is] application."

At oral argument, defendants supported their standing and jurisdictional contentions by noting that as recently as November 2009, proceedings had been held in the family court in Rockland County, resulting in an order granting M.S. visitation with the children. Plaintiffs pointed out that M.S. was a resident of Rockland County, whereas they, as New Jersey residents, were properly before this court under the Uniform Child Custody Jurisdiction and Enforcement Act, *N.J.S.A.* 2A:34–53 to –95 (UC-CJEA).

In her decision rendered from the bench, the judge determined that New Jersey "is a proper forum for this matter," and that plaintiffs had standing to bring their complaint. The judge found no "prima facie demonstration of evidence ... warranting the appointment of a guardian ad litem ... [or] a plenary hearing." Noting that defendants' motion to dismiss had been based on issues of standing and jurisdiction, the judge denied their motion to dismiss the complaint in its entirety. The judge did, however, dismiss plaintiffs' complaint for custody.[4]

Defendants then moved for summary judgment. In their "Statement of Undisputed Material Facts" defendants contended: (1) the "adoption decree was ... a non-family adoption pursuant to" New York law; (2) the decree "does not reserve any rights or otherwise afford any privileges of contact or enhanced status to ... [p]laintiffs"; (3) the "New Jersey statute pertaining to adoptions ... does not allow for the invasion of the autonomy of adoptive parents"; and (4) "there is no legal basis for ... [p]laintiffs to obtain relief consistent with their [c]omplaint."

Plaintiffs filed a response, disputing most of defendants' facts. Plaintiffs specifically noted that defendants were "clearly 'family members' [as] biological relatives of the children's mother[,]" and that it was "clear that the children were placed with ... [defendants], at least in part, due to the fact that they were relatives."

Following oral argument, the judge dismissed plaintiffs' complaint for grandparent visitation. The judge "examined whether the grandparent visitation statute [*N.J.S.A.* 9:2–7.1] was at odds with the public policy of New Jersey's Adoption Act [*N.J.S.A.* 9:3–37 to –56]" and concluded that "the overriding public policy and statutory law ... emphasizes the complete termination of the biological parents' rights, thus having the logical effect of terminating a biological grandparent['s] rights to visitation." The judge noted that her "finding was premised on the [L]egislature's specif-

---

[4] The judge did not issue an order dismissing plaintiffs' custody count until the October 15, 2010 order dismissing their complaint in its entirety.

ic rejection in New Jersey of the open adoption provision[,]" and concluded that "to require post-adoption visitation by grandparents would be in direct conflict" with New Jersey law.

Plaintiffs filed their notice of appeal but did not request oral argument. They contend that (1) the trial judge erred in granting summary judgment to defendants on the grandparent visitation claim; and (2) they have "an independent right to visitation as a result of their role as 'psychological parents' to the children."

We scheduled oral argument and requested the parties to submit supplemental briefs on the following question: should New York or New Jersey's adoption law govern resolution of plaintiffs' rights under New Jersey's grandparent visitation statute? We discuss this issue later in this opinion.

Initially, we note our standard of review. When reviewing a decision granting summary judgment, we apply the same standard as the motion judge used. *Henry v. N.J. Dep't of Human Servs.*, 204 *N.J.* 320, 330, 9 *A.*3d 882 (2010). Summary judgment is appropriate where the entire record before the judge, viewed in the light most favorable to the non-movant, demonstrates that "the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2; *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). Where, as here, the summary judgment decision rests on an interpretation of law, however, we review it de novo. *City of Atl. City v. Trupos*, 201 *N.J.* 447, 463, 992 *A.*2d 762 (2010).

The grandparent visitation statute provides:

a. A grandparent ... of a child residing in this State may make application before the Superior Court ... for an order for visitation. It shall be the burden of the applicant to prove by a preponderance of the evidence that the granting of visitation is in the best interests of the child.

b. In making a determination on an application filed pursuant to this section, the court shall consider the following factors:

(1) The relationship between the child and the applicant;

(2) The relationship between each of the child's parents or the person with whom the child is residing and the applicant;

(3) The time which has elapsed since the child last had contact with the applicant;

(4) The effect that such visitation will have on the relationship between the child and the child's parents or the person with whom the child is residing;

(5) If the parents are divorced or separated, the time sharing arrangement which exists between the parents with regard to the child;

(6) The good faith of the applicant in filing the application;

(7) Any history of physical, emotional or sexual abuse or neglect by the applicant; and

(8) Any other factor relevant to the best interests of the child.

c.   With regard to any application made pursuant to this section, it shall be prima facie evidence that visitation is in the child's best interest if the applicant had, in the past, been a full-time caretaker for the child.

[*N.J.S.A.* 9:2–7.1.]

Our adoption statute provides, in pertinent part: "The entry of a judgment of adoption shall ... terminate all parental rights and responsibilities of the parent towards the adoptive child except for a parent who is the spouse of the petitioner and except those rights that have vested prior to entry of the judgment of adoption[.]" *N.J.S.A.* 9:3–50(c)(1).

The judge determined that the Legislature had "specific[ally] reject[ed] ... open adoption"; this led the judge to conclude that the termination of parental rights inherent in adoptions has "the logical effect of terminating ... biological grandparents' rights to visitation." In support of this determination, the judge relied upon *W.P., supra,* 163 *N.J.* 158, 748 *A.*2d 515. The judge's reliance upon *W.P.* was, in fact, outcome determinative, as it precluded her from considering the factors set forth in the grandparent visitation statute.

We are satisfied that the judge erred in concluding that *W.P.* is dispositive of this matter. There, the adoptive parents were not relatives of either biological parent of the child. In that context, the Court "believe[d] that the [grandparent visitation] statute that permits visitation rights of parents of the biological parents of a child adopted by intact *nonrelative* adoptive parents is in conflict with the provisions of the Adoption Act." *Id.* at 168, 748 *A.*2d 515 (emphasis added). The Court's analysis of the relationship between the Adoption Act and the grandparent visitation statute was grounded entirely in the context of the nonrelative adoption

involved in that case. By contrast here, one of the adoptive parents is a blood relative of the children. In fact, plaintiffs alleged, defendants' status as relatives played a part in the decision to place the children with them in December 2004.

The Court in *W.P.* noted that the Legislature had failed to pass a proposed amendment to the Adoption Act that would have provided for " 'visitation or other type of communication with the child after the adoption by any person who had a relationship with or was biologically related to the adopted child[,]' " with " 'the consent of the adopting parent.' " 163 *N.J.* at 172, 748 *A.*2d 515. This legislative history led the Court to conclude that the Legislature had "rejected" the concept of open adoption. *Ibid.*

However, we consider another aspect of the legislative history of the Adoption Act to be particularly instructive here. In *Mimkon v. Ford,* 66 *N.J.* 426, 429, 332 *A.*2d 199 (1975), the Court considered whether the maternal grandmother of a child whose mother had died was "entitled to visit [the child] by virtue of *N.J.S.A.* 9:2–7.1 when the natural father and his second wife, who ... legally adopted the child, refuse to permit visitation[.]" The particular adoption statute that the Court considered *vis-à-vis* the grandmother's request provided that "[t]he entry of a judgment of adoption shall terminate all relationships between the child and his parents, and *shall terminate all rights, duties and obligations of any person which are founded upon such relationships[.]* " *N.J.S.A.* 9:3–30(A) (emphasis added).[5]

---

[5] *N.J.S.A.* 9:3–30(A) also provided that "when the adopting parent is a stepfather or stepmother, and the adoption is consummated with the consent and approval of the mother or father, ... such adoption shall not affect or terminate any relationships between the child and such mother or father[.]" Relying, in part, on that statutory language, the Court in *Mimkon* concluded that "grandparent visitation, in the context of the facts of this case, does not clash with the policies apparently embodied in the adoption statute." *Id.* at 436, 332 *A.*2d 199. Insofar as plaintiffs here rely on *Mimkon,* we consider the case factually distinguishable; we recognize, however, that the Court acknowledged generally the benefits of grandparent visitation, noting that "[i]t is common human experience that the concern and interest grandparents take in the welfare of

■ *N.J.S.A.* 9:3–30(A) was repealed in 1977. *L.* 1977, *c.* 367, § 20. It was replaced by *N.J.S.A.* 9:3–50(c)(1) which, notably, eliminated the highlighted language above. We thus read this statutory amendment as eliminating the automatic termination of "all rights . . . of any person which are founded upon" the child's relationship with his or her parent. *See State v. Crawley,* 90 *N.J.* 241, 246, 447 *A.*2d 565 (1982) (the deletion of a statutory provision indicates "that the Legislature made a conscious decision to exclude [the] provision"). Thus, although the Legislature at one time declined to enact a provision that would have permitted " 'visitation or other type of communication with the child after the adoption by any person who . . . was biologically related to the adopted child[,]' " *W.P., supra,* 163 *N.J.* at 172, 748 *A.*2d 515, no provision of the current Adoption Act expressly prohibits such visitation or communication.

Moreover, the judge failed to consider that defendants, by their conduct, had previously indicated that they did not regard the adoptions as barring plaintiffs' visitation. Defendants afforded plaintiffs such visitation for at least two years after the adoptions were finalized in New York. E.W. certified in 2010 that she and her husband "attempted to include [plaintiffs] in the children's lives over the last few years . . . by inviting them to ball games and occasionally allowing them to visit." Only when defendants allegedly "encountered harsh and severe criticism and uncondi-tional demands for fixed and regularized [grand]parenting time[,]" did they "object to [plaintiffs] attempting to intervene in [their] lives and telling [them] how to raise the[ ] children." Thus, defendants initially acknowledged plaintiffs' visitation rights but subsequently terminated those rights for reasons other than the finality of the adoptions per se.

---

their grandchildren far exceeds anything explicable in purely biological terms. A very special relationship often arises and continues between grandparents and grandchildren." *Id.* at 437, 332 *A.*2d 199.

The judge also failed to take into consideration the fact that M.S., the children's biological father, obtained an order in New York permitting him to have periodic visitation with the children post-adoption. Clearly these plaintiffs, who were the children's caretakers for almost two years, should be entitled to seek the same rights as the father whose parental rights were terminated by court order.

For these reasons, we conclude the judge's analysis should not have stopped short with reliance on *W.P.* The judge should have addressed the standards, both statutory and in the case law, pertinent to grandparent visitation.

In *Moriarty v. Bradt*, 177 *N.J.* 84, 827 *A.*2d 203 (2003), the Court cited studies confirming "the importance of the grandparent/ grandchild relationship in the lives of children" because the "love, nurturance, and acceptance which grandchildren have found in the grandparent/grandchild relationship 'confers a natural form of social immunity on children that they cannot get from any other person or institution.'" *Id.* at 97, 827 *A.*2d 203 (quoting Arthur Kornhaber M.D. & Kenneth L. Woodward, *Grandparents/Grandchildren: The Vital Connection* xiii-xiv (1981)). In consideration of these findings, the Court declined to prohibit grandparent visitation outright even where "fundamental right[s]" of "family and parental autonomy," *id.* at 103, 827 *A.*2d 203, were implicated.

In deference to those "fundamental right[s]" the Court held that the grandparent visitation statute "is subject to strict scrutiny and will only pass muster if it is narrowly tailored to serve a compelling state interest." *Ibid.* (citations omitted). To achieve that purpose and strike the appropriate balance between the rights of parents (whether natural or adoptive) and the rights of grandparents, the Court reiterated the standard it adopted three years earlier in *Watkins v. Nelson*, 163 *N.J.* 235, 748 *A.*2d 558 (2000).:

"Since the right of parents to the custody of their minor children is both a natural and legal right, the law should not disturb the parent/child relationship except for the strongest reasons and only upon a clear showing of a parent's gross misconduct or unfitness or of other extraordinary circumstances affecting the welfare of the child."

[*Moriarty, supra,* 177 *N.J.* at 112, 827 *A.*2d 203 (quoting *Watkins, supra,* 163 *N.J.* at 245, 748 *A.*2d 558).]

The Court in *Moriarty* concluded that "avoiding harm to the child is the polestar and the constitutional imperative that is necessary to overcome the presumption in favor of the parent's decision and to justify intrusion into family life." *Id.* at 113, 827 *A.*2d 203. The Court "approve[d]" imposing "the preponderance of the evidence burden" upon grandparents invoking the visitation statute, and held that such burden will "fully protect[ ] the fundamental rights of parents when coupled with the harm standard." *Id.* at 117, 827 *A.*2d 203.

We conclude that plaintiffs are entitled to be heard on the merits of their request for grandparent visitation. On remand, the judge shall weigh the standards and principles governing grandparent visitation in light of the record in this case, which, as noted, discloses: (1) defendants' consent to plaintiffs' visitation and participation in the children's lives for at least two years after the adoptions; (2) the children's biological father has been granted certain post-adoption visitation rights; and (3) plaintiffs "had, in the past, been ... full-time caretaker[s] for the child[ren]." *N.J.S.A.* 9:2–7.1(c).

Furthermore, as part of this analysis the judge shall also consider whether plaintiffs' request for grandparent visitation should properly be weighed against New Jersey's adoption laws or those of New York, as the children were adopted in that state. In that context, we note that New York's adoption statute provides that upon a child's adoption, "the birth parents ... shall have no rights over [the] child" and the "adoptive parents ... and the adoptive child shall sustain toward each other the legal relation of parent and child...." *N.Y. Dom. Rel. Law* § 117(1)(a), (c) (Consol.2011). New York courts have permitted " 'open adoption[s]', ... in which contact, including visitation, is permitted between the adopted child and members of his birth family" where such contact "may serve to promote the best interests of the child." *In re Adoption of Anthony,* 113 *Misc.*2d 26, 448 *N.Y.S.*2d 377, 378 (Fam.Ct.1982).

■ Section 72 of New York's Domestic Relations Law specifically grants a grandparent the right to seek visitation either where the parents are deceased or "where circumstances show that conditions exist which equity would see fit to intervene." *N.Y. Dom. Rel. Law*, § 72(1) (Consol.2011). In *People ex rel. Sibley v. Sheppard*, 54 *N.Y.*2d 320, 322, 445 *N.Y.S.*2d 420, 429 *N.E.*2d 1049 (1981), the New York Court of Appeals "uph[eld] the right of a natural grandparent to visitation rights with her grandchild, when authorized by court decree, despite an adoption of the child and the protestations of the adoptive parents" where such visitation was "in the best interest of [the] adopted child." The Court rejected the adoptive parents' argument that section 117 of the Domestic Relations Law "severs all of the child's ties to its natural family," finding that such an analysis of the statutory language was "overbroad[ ] and would interfere with the court's ability to protect the best interest of the child." *Id.* at 324, 445 *N.Y.S.*2d 420, 429 *N.E.*2d 1049. In fact, it is now well-established in New York that "[a] grandparent may seek visitation with a grandchild even after parental rights have been terminated or the child has been freed for adoption." *In re Ann M.C. v. Orange Cnty. Dep't of Social Servs.*, 250 *A.D.*2d 190, 682 *N.Y.S.*2d 62, 64 (1998).

Considering that the children were adopted according to the laws of New York, we conclude that on remand the judge must address which adoption law applies. This choice will not affect the analysis we require in this opinion, however, as we have determined that New Jersey's adoption statute does not preclude plaintiffs' quest for grandparent visitation.

We briefly address plaintiffs' contention that their right to grandparent visitation derives from their role as the children's "psychological parents." In *V.C. v. M.J.B.*, 163 *N.J.* 200, 748 *A.*2d 539, *cert. denied*, 531 *U.S.* 926, 121 *S.Ct.* 302, 148 *L.Ed.*2d 243 (2000), the Court set forth a "test [to] provide[ ] a good framework for determining psychological parenthood ... cases[,]" consisting of the following: "the third party must have lived with the child;

the third party must perform parental functions for the child to a significant degree; and ... a parent-child bond must be forged." *Id.* at 223, 748 *A.*2d 539.   In the absence of evidence to the contrary, we assume that these elements were met during the time the children lived with plaintiffs from March 2003 to December 2004.

On remand, the judge should consider whether those elements continued to be met during the period of plaintiffs' visitation with the children from the time they were placed in defendants' custody in December 2004 until 2008 when visitation ceased.   In short, plaintiffs are entitled to full consideration of their claims supporting their grandparent visitation request.

Reversed and remanded for further proceedings in conformity with this opinion.